#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| SARAH M. JAMES SAUNDERS,<br><br>        Plaintiff,<br><br>    v.<br><br>THE WILLOW DOMESTIC VIOLENCE CENTER, INC.,<br><br>        Defendant. | Case No. 2:19-cv-02235-KHV-ADM |

### **PRETRIAL ORDER**

On February 26, 2020, U.S. Magistrate Judge Angel D. Mitchell conducted a pretrial conference in this case. Plaintiff Sarah James Saunders ("Saunders") appeared through counsel Heather Schlozman, by phone. Defendant The Willow Domestic Violence Center, Inc. ("The Willow") appeared through counsel Marty T. Jackson, by phone.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the Court's approval, or by order of the Court to prevent manifest injustice. FED. R. CIV. P. 16(d) & (e); D. KAN. RULE 16.2 (c).

**1.     PRELIMINARY MATTERS.**

  **a.     Subject Matter Jurisdiction.** Subject-matter jurisdiction is invoked under 28 U.S.C. §§ 1331 and 1343, which provide for original jurisdiction in this Court for suits brought under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et. seq.* and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and is not disputed.

  **b.     Personal Jurisdiction.** The Court's personal jurisdiction over the parties is not disputed.

  **c.     Venue.** Venue in this Court is not disputed.

      **d.**    **Governing Law.**  Subject to the Court's determination of the law that applies to the case, the parties believe that the substantive issues in this case are governed by Title VII and the ADA and the case law interpreting those statutes.

**2.    STIPULATIONS.**

    **a.**    The following facts are stipulated:

        i.    Saunders is an African-American female.  She began working for The Willow as a Survivor Access Advocate on or about June 12, 2017.

        ii.    The Willow is a shelter for both male and female survivors of domestic violence.

        iii.    Saunders received a performance improvement plan on November 6, 2017. On November 17, 2017, Saunders' supervisor Felix Rodriguez ("Rodriguez") sent her an email telling her that the disciplinary action originally drafted would be disregarded due to unclear timeline and lack of evidence of efficient communication.

        iv.    In April and May of 2018, Saunders reported to her management team that she would require 6-8 weeks of leave for surgery in June of 2018.

        v.    In April of 2018, Saunders changed to a light duty assignment because of health concerns.

        vi.    In April of 2018, Saunders reported to Rodriguez that she had been visiting a survivor in a jail when a guard made racist comments to her.

        vii.    In May of 2018, Saunders learned that a female survivor had reported that a male survivor said vulgar and offensive things to her.  Saunders later had an experience with the same male survivor that made Saunders feel unsafe.

        viii.    Saunders then discovered that the male survivor was a registered sex offender, and she reported that fact to Rodriguez and other coworkers.

        ix.    Rodriguez believed Saunders acted out of a place of bias when she researched the sex offender registry.

        x.    A committee of three employees at The Willow decided to evict the male survivor because he was on the sex offender registry.  The committee agreed that the male survivor would not be permitted to access any shelter services.

        xi.    On April 30, 2018, Rodriguez directed Saunders to prepare a presentation for an internal training on African-American survivors of domestic

        xii.     violence. Rodriguez did not give her a deadline to complete the project other than telling her when the presentation was scheduled.

        xii.     When Rodriguez received the presentation PowerPoint, he commented in an email that it was "very thorough." Saunders presented her PowerPoint on the date the internal training was scheduled.

        xiii.    Saunders received a performance improvement plan on May 18, 2018.

        xiv.    The Willow terminated Saunders' employment on June 20, 2018.

**b.** The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment and trial:

    i.     The Willow's answers to Saunders' interrogatories (6 pages)

    ii.    Email from Alicia Cusano-Weissenbach, dated November 20, 2017 referencing incident on August 26, 2017 (1 page)

    iii.   November 6, 2017 Performance Improvement Plan (2 pages)

    iv.   Fact Sheet for staff education on the sex offender registry (2 pages)

    v.    May 18, 2018 Performance Improvement Plan (2 pages)

    vi.   Supervision Notes, Saunders 00033-00044

    vii.   Supervision Notes and logs (10 pages)

    viii.  Supervision notes 10/30/17 and 11/17/17 (1 page)

    ix.   6-month performance rating (2 pages)

    x.    Supervision notes (20 pages)

    xi.   Work from Home Agreement (1 page)

    xii.   Letter from Jodi Palmer M.D. dated April 27, 2017 (1 page)

    xiii.  The Willow Personnel Policy Guidelines (47 pages)

    xiv.  Amended charge of discrimination and notice of right to sue (2 pages)

    xv.   Orientation/Intake Approval Information (13 pages)

    xvi.  Position Description Survivor Access Advocate (1 page)

    xvii. EEOC training conducted by The Willow

      xviii.      Plaintiff's personnel file

**3.    FACTUAL CONTENTIONS.**

    **a.    Plaintiff's Contentions.**

While Saunders worked for The Willow, Rodriquez provided regular supervision notes praising her performance and conduct. Rodriguez noted that Saunders had "strong organizational skills," that Rodriguez had received "positive feedback" from other advocates about Saunders' work, and that Rodriguez appreciated Saunders taking the initiative to fill in for coworkers when there was a need to do so.

On November 6, 2017, Saunders received a performance improvement plan ("PIP"). Management later disregarded the PIP because it lacked adequate supporting evidence.

On Saunders' 6-month employment evaluation on November 27, 2017, she earned a rating of 3 out of 5. In April and May of 2018, Saunders engaged in a number of protected actions, including requesting reasonable accommodations, reporting race discrimination, requesting an extended medical leave for surgery, and reporting sexual harassment from a male survivor at The Willow shelter. Saunders also researched the sex offender registry and discovered that the male survivor appeared on it. Rodriguez discounted her complaints about the male survivor and chastised Saunders because she researched the sex offender registry for the male survivor's name. Rodriguez said this demonstrated bias against men. But within a week after Saunders reported that the male survivor had harassed her and was on the sex offender registry, The Willow staff voted to evict the male survivor because he was on the sex offender registry and presented a danger to advocates and residents. Approximately ten days after the vote to evict the male survivor and within a month after Saunders' reported sexual harassment, Rodriguez gave her another PIP. This PIP resurrected alleged performance problems he had coached her on before her six-month review

4

and which had not been repeated.  The only then-newly alleged performance deficiency related to an incident that involved two other staff members, neither of whom received PIPs.

Rodriguez also faulted Saunders' time management because Rodriguez said that Saunders failed to timely complete a presentation.  But Rodriguez admitted that he did not give Saunders a deadline to complete the presentation and that she presented it on the date it was scheduled.  Management also made much of the fact that Saunders cited the Huffington Post in her training, although it is unclear why that particular citation was improper.  Saunders was not instructed to avoid any particular sources.

The Willow alleges that Saunders endangered a resident's life in June of 2018 when she did not call 911 for the resident.  But the resident specifically directed Saunders *not* to call 911.  Management also referenced an incident in which Saunders allegedly failed to contact emergency services for a different resident.  However, there is no record of any such incident, Rodriguez was unaware of the incident, and Saunders does not know anything about the alleged incident.  Management subsequently terminated Saunders' employment on June 20, 2018, based on an email report from another supervisor, Alicia Cusano-Weisenbach, regarding Saunders' alleged failures to call 911.  Saunders had a known personal conflict with Cusano-Weisenbach, but The Willow did not investigate the veracity of Cusano-Weisenbach's report by talking with Saunders or residents.

      **b.**    **Defendant's Contentions.**

In May of 2018, Saunders complained to Rodriguez that a male resident leered at her and "undressed her with his eyes" on one occasion and, on a separate occasion, stood too close to her in a manner that invaded her personal space and made her uncomfortable.  In April of 2018, Saunders complained that a jail guard whistled racist songs at her and made racial comments about

5

her hair.  She complained about this to Rodriguez.  In May of 2018, Saunders told Rodriguez that she would need to take off six to eight weeks for surgery, beginning in June of 2018.  On June 20, 2018, The Willow terminated Saunders' employment.  The Willow contends that Saunders' employment was terminated for the following performance-related, good-faith business reasons:

    i.    Saunders was ordered to pick up "intakes,"[1] but refused to do so because she did not feel safe.  Saunders was employed as a Survivor Access Advocate and picking up "intakes" was part of her established job duties.

    ii.    Saunders refused to pick up a car seat for an intake between 1:00 a.m. and 3:00 a.m. on August 27, 2017, because Saunders did not want to go the shelter and get the car seat.  This was part of her established job duties as a Survivor Access Advocate.

    iii.    In November of 2017, Saunders failed to follow policy when she refused a father's request to speak with his daughter even though a signed Confidentiality Release was on file.

    iv.    Due to these and other violations of procedure and policy, Saunders was provided with a written PIP on May 22, 2018.  Saunders was advised that failure to comply with the PIP could lead to termination of her employment.

    v.    After the PIP was implemented, Saunders failed to timely complete and properly prepare a presentation on African American survivors for an internal training procedure.  The presentation was given on June 6, 2018.  Saunders performed poorly.  She was unprepared and did not answer questions accurately.

    vi.    On June 1, 2018, a supervisor saw Saunders leave a resident in the shelter business office alone while Saunders went outside the office to answer her personal cell phone.  The resident was left alone in the office, which contained all of the shelter clients' personal and confidential information, both in hard copy form and on the office computer.  It was a violation of The Willow's policy to leave a resident alone under those circumstances.

    vii.    On June 8, 2018, Saunders was alone in the shelter and called a supervisor to report that a resident was curled up on the ground, unable to move, and was incoherent.  The supervisor directed Saunders to call 911, but she unilaterally decided not to call 911.  There was a similar incident previously where Saunders failed to call 911 when a resident was observed in

---

[1] "Intakes" are domestic violence victims who are not shelter residents but instead are typically located at other remote locations, such as police stations or hospitals.  After "intakes" are picked up, they may become residents of The Willow once the onboarding process is complete.

>anaphylactic shock. These poor decisions put residents in danger and Saunders was again insubordinate by not following instructions from supervisors to call 911.

As a result of the above failures, The Willow terminated Saunders' employment.

## 4. LEGAL CLAIMS AND DEFENSES.

**a.     Plaintiff's Legal Claims.** Saunders asserts that she is entitled to recover upon the following alternative theories:

   i. **Hostile Work Environment (Count I)**: During Saunders' employment with The Willow, she was subject to a gender-based hostile work environment in violation of Title VII.

   ii. **Title VII Retaliation (Count II):** The Willow terminated Saunders' employment in retaliation for engaging in protected activity (*i.e.*, making complaints about sexual and racial conduct she experienced), in violation of Title VII.

   iii. **ADA Retaliation (Count II):** The Willow terminated Saunders' employment in retaliation for engaging in protected activity (*i.e.*, requesting reasonable accommodations and medical leave), in violation of the ADA.

**b.     Defendant's Defenses.** The Willow asserts the following defenses:

   i. The Willow denies that Saunders was subjected to an unwelcome, sexually hostile work environment that was offensive to her and to a reasonable person.

   ii. The Willow denies that Saunders suffered intentional discrimination based on her sex during her employment with the Willow.

   iii. The Willow generally denies that it retaliated against Saunders in any way as alleged in Count II of Saunders' Complaint.

   iv. The Willow specifically denies that Saunders' internal complaints about the male resident leering at her and standing too close to her constituted protected activity.

   v. The Willow specifically denies that it retaliated against Saunders for making a race discrimination complaint.

   vi. The Willow specifically denies that it retaliated against Saunders for requesting a disability accommodation as alleged in Count II of Saunders' Complaint.

7

      vii.      The Willow denies the nature and extent of Saunders' alleged damages.

      viii.      The Willow contends that Saunders failed to mitigate damages. She has a college degree, but has sought and found only part-time retail employment. She has voluntarily chosen to operate a sole proprietorship that generates no income.

**5.    DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

Saunders claims the following damages for each and all of her claims:

a.    Back pay, calculated by comparing what Saunders would have earned with her current wages through the date of the jury verdict in the amount of $58,837, using a calculation based on projected income shortfall through trial at the same rate.

b.    Front pay on an ongoing basis, calculated in the same manner as back pay, to be awarded by the court.

c.    Emotional distress damages resulting from The Willow's discriminatory and/or retaliatory treatment of Saunders, in such amount as the jury believes appropriate.

d.    Saunders' reasonable costs of litigation, including attorneys' fees, under 42 U.S.C. § 2000e-5(k) in the amount of $48,022.50 at a rate of $475/hour, plus expenses of $2,103.75 to date.

**6.    AMENDMENTS TO PLEADINGS.**

None.

**7.    DISCOVERY.**

Under the scheduling order and any amendments, all discovery was to have been completed by February 7, 2020. Discovery is incomplete. The Willow has agreed to produce Alicia Cusano-Weisenbach for deposition before the end of March. The parties understand and agree that this late deposition will not impact or delay summary judgment briefing.

Unopposed discovery may continue after the deadline for completing discovery so long as it does not delay the briefing of or ruling on dispositive motions or other pretrial preparations. Although discovery may be conducted beyond the deadline for completing discovery if all parties

are in agreement to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

**8.  MOTIONS.**

    **a.  Pending Motions.**

None.

    **b.  Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

        i.  Plaintiff intends to file motions in limine.

        ii.  Defendant intends to file a summary judgment motion.

The dispositive-motion deadline, as established in the scheduling order and any amendments, is **March 13, 2020**.

The parties should follow the summary-judgment guidelines available on the court's website:

http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf

Consistent with the scheduling order filed earlier in this case, the arguments and authorities section of briefs or memoranda must not exceed 30 pages, absent an order of the court.

    **c.  Motions Regarding Expert Testimony.**

Not applicable, *i.e.*, the parties have stipulated that no expert testimony will be used in this case.

**9.  TRIAL.**

The trial docket setting, as established in the scheduling order and any amendments, is **November 2, 2020 at 9:00 a.m., in Kansas City, Kansas**.  This case will be tried by jury.  Trial is expected to take approximately 4-5 days.  The court will attempt to decide any timely filed

9

dispositive motions approximately 60 days before trial.  If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

IT IS SO ORDERED.

Dated March 9, 2020, at Topeka, Kansas.

s/ Angel D. Mitchell<br>
Angel D. Mitchell<br>
U.S. Magistrate Judge